ELDRED *v.* SEXTON.

The fundamental principle established by the act of Congress of April 24th, 1820, and since governing the matter of sales of the public lands, that private entries are not permitted until after the lands have been exposed to public auction at the price for which they are afterwards sold, *held* to be applicable to a case—that of the grant by Congress, June 3d, 1856, of alternate sections designated by odd numbers, to the State of Wisconsin for the aid of the Chicago and Northwestern Railway.

There, after the line of the railroad was located and the price of sections within six miles designated by even numbers, doubled, that is to say fixed at $2 50 per acre, and after these were offered at public sale at *that* price and remained unsold, so that thenceforth they became open to private entry at $2.50, but not at less, the line of the road was changed by joint resolution of Congress, leaving *outside* of the six mile limits certain of these even sections; the joint resolution providing that the even sections of public lands "reserved to the United States by the act of June 3d, 1856 (the original grant), along the originally located route of railroad, and along *which no railroad has been constructed, shall hereafter be sold at $1.25 per acre.*"

---

* The Patapsco, 12 Wallace, 451.

*Held*, notwithstanding this provision that the "fundamental principle" above spoken of, was of so pervading a character, that although these sections, while within the six miles limit, had been offered at public sale at $2.50 and refused, they were not open to private entry now that by the change of location they were without that limit, until they had been offered for public sale at $1.25 per acre, and had been left unsold.

ERROR to the Supreme Court of Wisconsin; the case being thus:

An act of Congress, approved April 24th, 1820,* laid down the following general law about the public lands:

"The price at which the public lands shall be offered for sale shall be $1.25 an acre, and at every public sale the highest bidder who shall make payment as aforesaid shall be the purchaser; but no land shall be sold either at public or private sale for a less price than $1.25 an acre; and all the public lands which shall have been offered at public sale before the first day of July next, and which shall then remain unsold, as well as the lands that shall thereafter be offered at public sale, according to law, and remain unsold at the close of such public sales, shall be subject to be sold at private sale, by entry at the land office, at $1.25 an acre, to be paid at the time of making such entry as aforesaid," &c.

This statute being in force as the general regulation about public lands, Congress, by an act of June 3d, 1856,† in order to aid the construction of a line of railroad from Fond du Lac, at the south end of Lake Winnebago, in the State of Wisconsin, northerly, to the north line of the said State, granted to the said State of Wisconsin every alternate section of land designated by odd numbers, for six sections in width, on each side of the road. In pursuance of a well-settled policy of the government on the subject, the price of the even-numbered sections remaining to the United States was doubled, and the act declared,

"Nor shall any of said lands become subject to private entry until the same shall have first been offered at public sale at the increased price."

* 3 Stat. at Large, 566.                          † 11 Id. 20.

This land grant, by the legislature of Wisconsin, became vested in the Chicago and Northwestern Railway Company, which had, before the 3d of May, 1859, located the line of its road, so that certain lands, the subject of the controversy in this case, were within the prescribed limits. Up to that day they had never been brought into market, but upon that day, by proclamation of the President, they were offered for sale at $2.50 per acre. Not being sold, they remained subject to private entry at that sum. A change in the route of the road being desirable, Congress was asked to authorize it, and this was done by the joint resolution of April 25th, 1862.*

The first section of the resolution authorized a change of the location of the line of the railroad.

The third and fourth sections of the resolution were thus:

"SECTION 3. The Secretary of the Interior is hereby authorized to cause all even sections or parts of even sections of public land that may be brought within six miles of the new line of railroad, to be sold at the same price and in the same manner as those have been upon the originally located route. And all purchasers, or their heirs or assigns, within the six-mile limits of the said originally located route who shall be more than six miles from the new line, and who have paid the sum of $2.50 an acre, shall have the right either to exchange their locations upon the line as first established to the new line, upon the same terms, in like quantities, and in the same manner as on the line first established; or, at their option, to enter, without further payment, anywhere within the Menasha land district, in the State of Wisconsin, an additional quantity of public lands subject to private entry, at $1.25 an acre, equal to the quantity entered by them at $2.50 an acre, so that the lands originally entered by them shall *thus* be reduced to the rate of $1.25 an acre.

"SECTION 4. The even sections of public lands, reserved to the United States by the aforesaid act of June 3d, 1856, along the originally located route of railroad north of the said town of Appleton, and along which no railroad has been constructed, *shall hereafter be sold at $1.25 an acre.*"

---

* 12 Stat. at Large, 618

A change in the route of the road was made, which left the lands now in question outside of the new limits. After this, but before any public offer of the lands for sale at the reduced price, one Eldred applied to the register and receiver of the local land office, and in 1865 and 1866 was allowed to enter them at the price of $1.25 per acre. The entries, however, were subsequently cancelled by the Commissioner of the General Land Office, on the ground that when they were made the lands were not subject to private entry at such minimum price, and this decision, on appeal, was affirmed by the Secretary of the Interior. On the cancellation of the entries the lands were offered at public sale at the minimum price of $1.25 an acre, and not being sold were subsequently purchased at private entry at that price by one Sexton, to whom patents were issued in 1870.

Hereupon, Eldred filed a bill in one of the State courts of Wisconsin to have Sexton declared a trustee for him, and to have a surrender of the patents, and conveyance of all Sexton's rights to him.

The court decreed against the complainant; and that decree being affirmed in the Supreme Court of the State, the case was brought here by him for review.

The sole question was whether the action, as above stated, of the Commissioner of the General Land Office and of the Secretary of the Interior was correct. If correct, it was conceded that the defendant's title, obtained subsequently, could not be impeached. If incorrect, the defendant was to be treated as a trustee holding the legal title for the plaintiff.

The solution of the question depended, of course, upon the effect to be given to the land-grant legislation, already quoted, for the benefit of Wisconsin.

*Mr. J. P. C. Cottrill, for the plaintiff in error:*

When and how the public lands shall become subject to private entry at the minimum price does not depend upon any mere practice of the land department of the government, or upon the "say so" of the public servants who administer

that department, but depends upon the enactments of Congress; and when these enactments have been complied with so that the public lands once become subject to private entry, they remain so unless their condition is again changed by force of law. There is no discretionary power reposed in the officers of the land department by which they can say that certain lands shall be in the market subject to private entry to-day, and that to-morrow they shall not be.

Now, confessedly, at the close of the offer of them at public sale, on the 3d of May, 1859, these lands became and remained subject to private entry at the price of $2.50. And they were thus subject to private entry, of course, at *that* price when Congress passed its explanatory resolution. Now, what does that resolution say? Simply that "they *shall* be sold at $1.25 per acre." Congress of course knew that the even sections within the six-miles limit were in the market, subject to entry at $2.50 an acre. And, having this knowledge before them, it is but respectful to that body to infer that if it had been their intention to withdraw these lands from market and not to subject them to private entry until they had again been offered at public sale at the minimum of $1.25 per acre, they could have expressed such intention in clear terms.

In the second section of the Land-Grant Act of June 3d, 1856, they did not leave it a matter of doubt or construction as to whether the even sections within the six-mile limits of the grant should become subject to private entry, by being first offered at public sale at the ordinary minimum price of $1.25 per acre, as provided by the general law, but expressly enacted that they should first be offered at public sale at the increased price.

The only change, therefore, produced upon these lands by the joint resolution was, we submit, to reduce their price from $2.50 to $1.25 per acre. In other respects they stood in the same condition and situation to which they had been brought by the force of other laws and the acts of the officers and agents of the government under those laws.

Suppose that prior to the passage of the resolution, and

while the line remained unchanged, and while the even sections within six miles of that line were in the market subject to private entry at $2.50 per acre, a person had entered a quarter section of land, and paid therefor $2.50 per acre. Now if, after the passage of the resolution and the relocation of the line, this quarter section was not within the six miles of the new line, the person would, under the third section of the resolution, be entitled to enter another quarter section at $1.25 per acre. Now, suppose that he actually entered the additional quarter section, what would be the practical result of the transaction in reference to the first entry? Certainly that the first quarter section, by virtue of the operation of the explanatory resolution, was in effect entered at private entry at $1.25 per acre.

The theory of the government in this land-grant legislation has been, and is, that the public lands within six miles of a railroad would be at least doubled in value by the location and construction of a road so near them, and that such increased value was a compensation to the government for giving the alternate sections to aid in the construction of the road. Hence the price of $2.50 per acre within the six-mile limits has always been deemed the equivalent of $1.25 without those limits. We say, therefore, that the offer of these lands at public sale at the minimum price of $2.50 an acre, while they were within the six-mile limits, was equivalent to an offer of the same at the price of $1.25 when outside of those limits. At the public offer of $2.50 per acre of lands within the six-mile limits the lands had been refused, and there was no sense in offering them, when put by the change outside the limits, at $1.25 per acre. Practically, as we say, they had been offered at that and refused. Congress so viewed the matter, and intended, we submit, that they should not be *re*offered.

Nowhere, in all our legislation in reference to the public domain, can a law be found which requires lands that have once become subject to private entry, and the price of which may afterward be changed, to be again offered at public sale, after the change in price, before they shall be subject

to private entry, or, in other words, that a mere change in price withdraws lands from market; and if any such requirement exists, it is based wholly upon the practice of the Land Office; a vicious practice as respects these lands, since it is arrayed against a positive enactment of Congress as expressed in the explanatory resolution.

*Mr. S. U. Pinney, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

It is a fundamental principle underlying the land system of this country that private entries are never permitted until after the lands have been exposed to public auction, at the price for which they are afterwards subject to entry.

They are first surveyed, then a day is appointed for their sale by the President, which is to be kept open for two weeks. At this sale they are offered at a minimum price, and cannot be sold for less, but may be sold for as much more as any one will give, and what remains unsold at the close of such sale is subject to entry at that price.

There is an obvious reason for requiring a public sale before leaving the lands open to private entry. It is to secure to all persons a fair and equal opportunity of purchasing them, and to obtain for the government the benefit of competition in case the lands should be worth more than the price fixed by Congress. This system commenced at an early period of our history, and was perfected in 1820. For a period of twenty years, beginning with the commencement of this century, the public lands were sold on credit at not less than two dollars an acre; but the mode of selling on credit working badly, it was in 1820 abandoned, and the price reduced to $1.25 per acre.*

Since that time the great body of the public domain has been brought into market, after proper notice, at this reduced price, and, unless Congress by special act ordered otherwise, private entries have never been allowed unless

---

* 2 Stat. at Large, 73: 3 Id. 566.

the land applied for had been previously offered at public sale to the highest bidder at the same price. This has been the established practice of the Land Office, sanctioned by the law officers of the government, and recognized by this court as a leading feature in our system of land sales.*

The inquiry arises whether Congress intended to change this system in the new policy adopted by it, to aid States by grants of lands to build railroads. This policy is of comparatively recent date, but there is nothing that we are aware, in any of the various acts on the subject, which tend to show that it was the purpose of Congress, in its land-grant legislation, to alter the *manner* in which the public lands had been brought into market and made subject to private entry. It is true the minimum price of the lands within certain prescribed limits was doubled, on the supposition that the construction of the contemplated roads would enhance the value of the lands to such an extent that the government would be enabled to realize as much for them as if the grants had not been made, but in all other respects the general system for the disposition of public lands was preserved. It is difficult, therefore, to see how the plaintiff can succeed, unless the legislation on which he rests his title was designed to be exceptional, which we think was not the case. The grant was an ordinary one to build a road in Wisconsin, for which a change of route was desirable, after the line had been located. This change was authorized by Congress, but before the line was relocated the lands in question, being within the six-mile limit, had been, at a public land sale, offered for sale at $2.50 per acre, and not being sold, were subject to entry at that price, but not at any less sum. The location of the new route left them outside of the required distance, and legislation was necessary to take them out of the condition of lands affected by the construction of a railroad, and to restore them to the general body of the unsold lands, so that they could be sold in the same manner and at the same price that the public

---

* Johnson *v.* Towsley, 13 Wallace, 88; Chotard *v.* Pope, 12 Wheaton, 588; 2 Opinions of the Attorney-Generals, 200; 3 Id. 274; 4 Id. 167.

domain is usually subject to sale. This object was accomplished by the joint resolution of April 25th, 1862, which declares that "these lands should hereafter be sold at $1.25 per acre." It is contended that this declaration fixed the price absolutely, and subjected them to private entry at that price, without any further proceeding. This proposition is based on the idea that Congress intended to adopt a different rule for the disposition of these lands from that which had always obtained for the disposition of other public lands; but there is nothing in the circumstances of this legislation which tends to prove an intentional abandonment of a long-existing policy. Why make an exception in the case of these lands? There was no exigency requiring it, nor any reason to suppose that Congress had any purpose to place them on a different footing from other government lands for sale at $1.25 an acre. Such a purpose would conflict with the general land system, and disturb its harmony, and cannot be imputed to Congress in the absence of an express declaration to that effect. This system required that all lands should be brought into market, after proper notice, so as to afford competition before being subject to private entry. It is true the lands in question were once offered at public sale at $2.50 an acre, but the reason of the rule required that they should be again offered to the highest bidder, because their condition as to price had been changed, and there had been no opportunity for competition at the reduced price. Congress meant nothing more than to fix $1.25 as their minimum price, and to place them in the same category with other public lands not affected by land-grant legislation. When they were withdrawn from the operation of this legislation, and their exceptional status terminated, the general provisions of the land system attached to them, and they could not, therefore, be sold at private entry, until all persons had the opportunity of bidding for them at public auction.

It follows that the plaintiff's entries were invalid and rightly cancelled, because they were made before the lands had been proclaimed for sale at the minimum price of $1.25

an acre, and that the defendant's entries were in accordance with law, as they were located after the lands had been properly brought into market.        JUDGMENT AFFIRMED.