PERELES et al. v. WEIL, U. S. Marshal.

(District Court, E. D. Wisconsin. November 15, 1907.)

1. CRIMINAL LAW—OFFENSES AGAINST UNITED STATES—PROCEEDINGS FOR REMOVAL TO ANOTHER DISTRICT.

In an examination before a commissioner under Rev. St. § 1014 [U. S. Comp. St. 1901, p. 716], of a person charged with an offense against the United States in another district, it is necessary to determine whether such an offense has been committed, and whether there is probable cause to believe the defendant guilty. An indictment is presumptive evidence of probable cause if sufficient in substance on its face to show that an offense against the United States has been committed; otherwise, the defendant should be discharged.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 493.]

2. HABEAS CORPUS—MATTERS REVIEWABLE.

In a habeas corpus proceeding for the discharge of a prisoner committed by a commissioner under Rev. St. § 1014 [U. S. Comp. St. 1901, p. 716], to be held for trial for an offense against the United States, the court will not review the finding of the commissioner where the evidence is conflicting, but if it finds that all the evidence taken together does not support a finding of probable cause the commissioner's ruling may be disregarded and the defendant discharged.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 25, Habeas Corpus, §§ 87–89.]

3. CONSPIRACY—CONSPIRACY TO DEFRAUD UNITED STATES—ENTRY OF COAL LANDS.

An indictment which charges defendants with conspiracy to defraud the United States, by obtaining for a certain corporation coal lands of the United States, in excess of the quantity which it could lawfully acquire under the coal land purchase laws, by means of entries to be made by certain of the defendants as individuals, thereby securing patents to themselves, paying for the lands with money furnished by the corporation, and thereupon conveying such lands to the corporation, and which charges as overt acts the making of applications for such entries the acquiring of patents and the making of such conveyances, does not state an offense under Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], where it does not aver that such defendants were employed or procured by the corporation to make applications for the entries in its behalf, that there was any fraudulent intention in fact in making the entries, or that the patents issued thereon were void; there being nothing in the statute to prevent the corporation from lawfully acquiring by purchase any quantity of coal lands, the title to which or the preference right to purchase which had been lawfully acquired by others.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, § 97.]

Habeas Corpus.

Charles Quarles, Hugh Ryan, W. J. Turner, and Jas. G. Flanders, for petitioners.

E. J. Henning, Asst. U. S. Atty.

SANBORN, District Judge. This is a habeas corpus proceeding brought by the defendants, James M. Pereles, Thomas J. Pereles, Guy

D. Goff, Charles F. Hunter, and Henry M. Benjamin. Petitioners were held to bail by Francis Bloodgood, Commissioner of the United States, in a proceeding commenced before him upon complaint of the Assistant District Attorney of this district, charging a conspiracy to defraud the United States, and praying for the apprehension of the defendants. Petitioners were arrested under a commissioner's warrant, and a hearing was had before the commissioner under section 1014, Rev. St. U. S. [U. S. Comp. St. 1901, p. 716]. At such hearing or examination the government offered an indictment found by a grand jury at Denver, Colo., charging defendants with conspiracy, and also gave proof of the identity of the petitioning defendants. The commissioner thereupon held that more than three years had elapsed from the time of the formation of the conspiracy, as alleged in the indictment, and that while there was proof of overt acts within three years from finding the indictment, there was nothing to show any conscious participation of the defendants in the conspiracy at the time of the commission of such overt acts. Evidence was then introduced by the government, upon which the commissioner found a conscious participation of the defendants in the conspiracy at the time of the commission of overt acts by some of the defendants within three years from the finding of the indictment, and concluded that the prosecution was not barred. The commissioner also found from the evidence before him that the conspiracy was formed at Milwaukee, Wis., and not at Glenwood Springs, Colo., as charged in the indictment; but he further held that the commission of overt acts in Colorado enabled the government to prosecute the defendants either in Colorado or Wisconsin. He therefore held the petitioners, residents of Milwaukee, to bail. Petitioners declined to give bail and were taken into custody by the marshal, whereupon they brought their petition for habeas corpus and certiorari. Both writs were issued, and under the latter proceeding all testimony and exhibits before the commissioner were returned into court. No motion for an order for the removal of the defendants to Colorado for trial has as yet been made by the United States. The commissioner discharged the defendants, Johnson, Wehr, Canright, and Carter on the ground that they were not shown to have participated in the renewed conspiracy within three years before the finding of the indictment.

Upon the hearing of the habeas corpus proceeding, the petitioning defendants raised the question of venue and of the jurisdiction of the District Court for the District of Colorado, on the ground that the alleged offense was found by the commissioner to have been committed and was actually committed in Milwaukee, Wis., and not in Colorado, and that the commission of overt acts in Colorado would not give the Colorado court any jurisdiction to try the defendants in that district. They also questioned the sufficiency of the indictment, and urged that neither the indictment nor the testimony before commissioner shows any conscious participation of the petitioning defendants within three years next before the finding of the indictment.

In an examination by commissioner under section 1014, Rev. St., the indictment is presumptive evidence of probable cause as against the defendants. Hyde v. Shine, 199 U. S. 62, 25 Sup. Ct. 760, 50 L.

Ed. 90; Tinsley v. Treat, 205 U. S. 20, 27 Sup. Ct. 430, 51 L. Ed. 689. In this proceeding it is necessary to be determined whether an offense against the United States has been committed, and whether there is probable cause to believe the defendants guilty. In re Richter (D. C.) 100 Fed. 295; Horner v. U. S., 143 U. S. 207, 12 Sup. Ct. 407, 36 L. Ed. 126; Greene v. Henkel, 183 U. S. 249, 22 Sup. Ct. 218, 46 L. Ed. 177. Under the sixth amendment to the Constitution there is also a question whether the petitioning defendants shall be removed for trial to the district in which the indictment was found, and whether the District Court of that district has jurisdiction of the offense charged in the indictment. The sixth amendment to the Constitution provides that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury within the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law. It is also the rule in habeas corpus proceedings that in determining the question of probable cause the court will not review the finding of the commissioner where the evidence is conflicting. The question is, whether the evidence as a whole supports the finding? The court may review the evidence to ascertain what it really shows, and if it finds that all the evidence taken together does not support the commissioner's finding of probable cause, his ruling may be disregarded, and the defendants discharged. Ex parte Rickelt (C. C.) 61 Fed. 203; In re Byron (C. C.) 18 Fed. 722; Horner v. U. S., 143 U. S. 570, 12 Sup. Ct. 522, 36 L. Ed. 266; Terlinden v. Ames, 184 U. S. 270, 22 Sup. Ct. 484, 46 L. Ed. 534; Ornelas v. Ruiz, 161 U. S. 509, 16 Sup. Ct. 689, 40 L. Ed. 789; Grin v. Shine, 187 U. S. 181, 23 Sup. Ct. 98, 47 L. Ed. 130; In re Wadge (C. C.) 16 Fed. 332; U. S. v. Peckham (D. C.) 143 Fed. 625; Hyde v. Shine, 199 U. S. 62, 25 Sup. Ct. 760, 50 L. Ed. 90; U. S. v. Lantry (C. C.) 30 Fed. 233. If the indictment is not sufficient on its face to show that an offense against the United States has been committed, the defendants should be discharged. U. S. v. Conners (D. C.) 111 Fed. 734; Greene v. Henkel 183 U. S. 249, 22 Sup. Ct. 218, 46 L. Ed. 177; U. S. v. Lantry (C. C.) 30 Fed. 232; In re Byron (C. C.) 18 Fed. 722; In re Greene (C. C.) 52 Fed. 104; In re Doig (C. C.) 4 Fed. 193; In re Buell, 3 Dill. 116, Fed. Cas. No. 2,102; In re Corning (D. C.) 51 Fed. 205; In re Terrell (C. C.) 51 Fed. 213; In re Wolf (D. C.) 27 Fed. 606; In re Huntington (D. C.) 68 Fed. 881. If the indictment is good in substance, lacking only some technical averment of time or place or circumstances required to render it free from technical defects, the order for removal will be issued if the evidence supplies such defects, and shows probable cause to believe defendants guilty. Greene v. Henkel, 183 U. S. 249, 22 Sup. Ct. 218, 46 L. Ed. 177; Tinsley v. Treat, 205 U. S. 20, 31, 27 Sup. Ct. 430, 51 L. Ed. 689.

The first question to be considered is the substantial sufficiency of the indictment, for if it states no offense the petitioners should be discharged. The indictment charges the conspiracy or agreement, the means to be employed, and the overt acts. In effect it states: Defendants unlawfully, corruptly, wickedly, and maliciously conspired, combined, confederated, and agreed together. They so conspired to obtain from the United States, for the Wisconsin Fuel & Mining

Company, afterwards incorporated by some of the defendants, and not made a defendant, 962 acres of coal lands in excess of the quantity the corporation could lawfully obtain under the coal land act. The means by which the land was to be obtained were by certain of the defendants making entries as individuals, paid (paying) the government price, thereby securing patents vesting title in the entrymen, and making conveyance of such title to the corporation, the moneys necessary to make such payment being in fact furnished by the corporation. Overt acts, consisting of signing applications or declaratory statements, signing deeds running to the corporation, procuring patents, and making payments for the entries to the receiver of the land office. It is not charged that the obtaining of the land was fraudulently, knowingly, or intentionally done, nor that the entries were simulated, fictitious, or mala fide. There is no averment of deceit practiced, nor facts suppressed, nor land officers misled, nor of the contemplated commission of intentional fraud. All that appears is the making of entries which vest title in the entrymen, and then combining or consolidating the several titles in the corporation. It is not charged that the titles were fraudulent, void, or even voidable; the patents were to vest the title.

In this connection it may also be stated that the evidence taken by the commissioner clearly shows that the petitioners were innocent of any intention to commit any fraud or do any wrong. There is no indication of concealment. In December, 1902, shortly after the scheme of acquiring coal lands was launched, they published and distributed a prospectus in which it was stated that it was the purpose of the directors to avail themselves out of the proceeds of the first sales of the treasury stock for the purpose of completing the payments to the government for the entered lands. This circular, in the absence of any charge of fraud, concealment, or wrongful intent in the indictment, and of any evidence of scienter, or suspicion of any consciousness of wrongdoing in the evidence, must certainly acquit defendants of any intentional fraud. The commissioner found that no wrongful intent was shown, but held that this question was one for the trial court in Colorado. If, therefore, petitioners are to be held for trial, it is because the acts done by them operate as a fraud, so that a corrupt intent is part of and implied from the very acts themselves. The acts forbidden, as will be seen later, not being themselves criminal, and there being no charge of evil intent, or that the acts were knowingly, intentionally, or corruptly done, and it appearing from the evidence that the defendants in fact acted innocently, the question is presented whether acting in ignorance of the alleged prohibition of the statute is cognizable as criminal conspiracy. See State v. Cutter, 36 N. J. Law, 125; People v. Powell, 63 N. Y. 88; People v. Flack, 125 N. Y. 324, 26 N. E. 267, 11 L. R. A. 807. In order to get the force of the indictment it is necessary to examine the coal land purchase statute, being sections 2347–2350, Rev. St., and the conspiracy statute, section 5440. The coal land act, passed March 3, 1873 (Act March 3, 1873, c. 279, 17 Stat. 607 [U. S. Comp. St. 1901, p. 1440]), in effect provides that every adult citizen, or one who has declared his intention to become such, or any association of

persons severally so qualified, may enter 160 acres of vacant coal lands to individuals, or 320 acres to such associations, upon payment of $10 per acre when the lands are more than 15 miles from any completed railroad, and $20 when within that limit. Section 2347. The next section provides for preference rights following improvement. Section 2350 provides that only one entry by the same person or association shall be authorized; "and no association of persons any member of which shall have taken the benefit of such sections, either as an individual or as a member of any other association shall enter or hold any other lands under the provisions thereof; and no member of any association which shall have taken the benefit of such sections shall enter or hold any other lands under their provisions." The conspiracy statute provides that if two or more persons conspire either to commit an offense against the United States or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all shall be punished, etc.

The indictment does not charge a conspiracy to commit an offense against the United States, because no statute has made criminal any of the acts charged, nor are there any common-law crimes or constructive crimes against the government. U. S. v. Eaton, 12 Sup. Ct. 764, 144 U. S. 677, 36 L. Ed. 591; U. S. v. Hudson, 7 Cranch, 32, 3 L. Ed. 259; U. S. v. Lacher, 134 U. S. 624, 10 Sup. Ct. 625, 33 L. Ed. 1080; Todd v. U. S., 158 U. S. 282, 15 Sup. Ct. 889, 39 L. Ed. 982. The first sentence of the conspiracy statute may therefore be dismissed as not material to the inquiry, leaving only for determination whether the obtaining of the land for the corporation in the manner charged was a fraud against the United States. What is it to defraud the United States, in any manner or for any purpose? Judge Deady defined the word as follows: To defraud the United States is to deprive or divest it of any property, money, or thing otherwise than as the law requires and allows. U. S. v. Thompson (C. C.) 29 Fed. 86. The only basis for this indictment is that defendants conspired to vest in the corporation a greater amount of land than the coal land purchase act permits, and thus divest the government of its public lands in a manner not allowed by law. The vital question therefore is whether the plan was to enable the corporation to violate the law limiting its power to enter public coal lands, or whether it was to combine or consolidate the separate titles into one legal ownership in the corporation, the patentees taking back shareholders' interests in the shape of capital stock.

It is plain that there is nothing in the coal land statute intended to prevent either individual or corporation from acquiring any amount of coal land which it may be possible to pay for or secure. All that is meant is that neither one shall, either by a direct entry, in the grantee's own name, or indirectly by procuring an entry by an agent or servant, take from the United States more than the limited quantity. An individual having exercised his right of entry by securing 160 acres may buy of others by ordinary purchase as much more as he pleases; but he cannot acquire an acre from the government. If he does so, either by direct application in his own name, or by

employing another to make entry in the name of the latter and then convey to him, he at once becomes involved in conspiracy, perjury, and fraud. He violates the policy of fair play found in every disposal statute ever passed by Congress, designed to secure equal opportunity for all, and incidentally, but to a limited extent, to prevent monopoly. He thus commits a fraud on the United States by securing its lands in a way not authorized by the law, and it is of no consequence that the government, having obtained the money, suffers no pecuniary loss. A definite and important public policy has been violated and circumvented, which may be frustrated either by avoiding the patent, or punishing the offender if he has sworn falsely or suborned perjury, or has conspired with his tool or dummy to commit the fraud. On the other hand, if the owner of 160 acres of coal land, holding by valid entry, purchases more coal land from another, by ordinary conveyance, without attempting to make any further entry either by himself or his agent, he not only violates no policy and commits no fraud, but simply takes the benefit of the important and favored right of free and unrestricted alienation; a right which has been nowhere more emphatically encouraged than by the courts of the United States in public land cases. This power of unlimited disposition has always been a highly favored one. The pre-emption law declared that all sales by the pre-emptor prior to the issue of the patent should be void, but in Myers v. Croft, 13 Wall. 291, 20 Sup. Ct. 562, the Supreme Court sustained the validity of a conveyance made the same day the certificate of purchase issued, and before the patent. This was upon the ground that the purpose of the statute was only to prohibit transfers of the right of pre-emption, not of the title to the land, equitable or legal. In Oliver v. Piatt, 3 How. 333, 410, 411, 11 L. Ed. 622, 657, Judge Story declares that an agreement as to the purchase of lands at a public government sale is valid. In Fackler v. Ford, 24 How. 322, 16 L. Ed. 690, a contract to convey lands after they should be obtained from the United States was decreed to be specifically enforced, notwithstanding the act of March 31, 1830, denouncing contracts between persons designing to bid at public sales intended to suppress competition. It was held that there was nothing in the contract which could be construed as an agreement not to bid, or hinder others from bidding. In Lamb v. Davenport, 18 Wall. 317, 21 L. Ed. 759, it is held that contracts made by actual settlers on the public lands concerning their possessory rights and concerning the title to be acquired from the government are valid, unless forbidden by some positive law. And it is further held that a provision in a subsequent act of Congress, forbidding the future sale of the settler's interest before patent, so far from invalidating such contracts made before its passage, raises a strong implication in favor of their validity. And in Arnold v. Christy, 4 Ariz. 19, 33 Pac. 619, it was held that an applicant for desert lands, to be reclaimed by irrigation, may lawfully make a contract, before his title vests, to convey the land, because the statute does not declare such contract void. This favored right of alienation was adopted by the Secretary of the Interior as part of the system designed for the entry of coal lands. In the land office rules in force when the entries here in question were made there

appears a provision for the transfer of the preference right of an applicant for coal lands, before making payment or receiving his certificate. In a circular issued in 1882, paragraph 37, p. 11, reads:

"Assignments of the right to purchase will be recognized when properly executed. Proof and payment must be made within the prescribed period, which dates from the first day of the possession of the assignor who initiated the claim."

This practice is changed in the circular of 1907, which provides that the assignment of a preference right of entry will not thereafter be recognized. It was not until 1907 that any provision was made in the rules requiring in the declaratory statement a clause that the application was made for the exclusive benefit of the applicant, and not, directly or indirectly, in whole or in part, in behalf of any other person. It is easy to see how the practice of the office, down to 1907, was calculated to create such an innocent though mistaken belief as existed in this case, that it was entirely proper and lawful for entrymen to sell their claims. To apply now, in 1907, the changed rules, in place of the former liberality, is somewhat harsh, savoring, to some extent, of an ex post facto proceeding. Indeed, it is difficult to conceive how Congress could have adopted any policy except that of free and unhampered alienation, without destroying the practical value of the coal lands. If the right to sell had been so restricted as to prohibit individuals to hold more than 160 acres, or corporations more than 320 acres, the field of transfer would be so restricted as to seriously impair the favored power of sale, and a great part of the value of the lands would be thus taken away. It is well settled that Congress has no power or authority over land after patent issued. Morgan v. Rogers, 79 Fed. 577, 25 C. C. A. 97, writ of error dismissed Rogers v. Morgan, 173 U. S. 702, 19 Sup. Ct. 879, 43 L. Ed. 1185; Johnson v. Drew, 171 U. S. 93, 100, 43 L. Ed. 88, 18 Sup. Ct. 800.

It does not appear in this case, either from the indictment or evidence taken by the commissioner, that the corporation made entries through agents or dummies. On the contrary, the proof is that certain of the defendants, nine in number, having made applications for coal lands, and having the right to enter them on payment of the government price, made a proposal to the corporation to sell their interests or preference rights in the lands for $350,000 stock for their claims, amounting to about 9,300 acres of coal land, oil land, and mineral land. This proposal was accepted by the corporation December 12, 1902, and the corporation proceeded to acquire the title to a considerable part of the lands covered by the proposition. As to the coal lands the method employed was for the company to furnish the money to complete the entries in the names of the respective claimants, by whom the money was paid at the land office, and upon patents issuing to them they conveyed to the corporation. Had any evil intent been present, any fraudulent purpose, any consciousness of wrongdoing, any concealment or false representation, it might not be difficult to find in these facts a fraudulent and corrupt intent to defraud the United States by fictitious, simulated, or dummy entries, in which the corporation was the real entryman, and the defendants merely

its agents or instruments to enable it to carry out a perversion or evasion of the statute. But in the absence of all these sinister motives, and in view of the settled right of free disposition, encouraged by the government itself through the rule of the land office already referred to, it becomes entirely clear that no fraud was either committed or intended, and that the indictment charges, and the evidence shows, no criminal offense.

In all the cases which have occurred under the coal land statute, there was actual fraud, and perjury, and dummy entrymen. In U. S. v. Trinidad Coal & Coking Co., 137 U. S. 160, 11 Sup. Ct. 57, 34 L. Ed. 640, which was a bill in equity to set aside patents, the corporation hired its own servants and officers, some of whom had had the benefit of the law, to take up and convey to it coal lands. There was fraud and perjury and indirect entry through dummy claimants. In U. S. v. Lonabaugh, U. S. District Court of Wyoming, July 19, 1907 (unreported), a conspiracy was charged to be carried out by defendants procuring entrymen to make false, fictitious, and fraudulent entries and convey to some one of defendants, or to a corporation, in collusion with defendants and for their use and benefit, thereby enabling defendants or said company to fraudulently acquire from the United States large tracts of coal lands in excess of the amount allowed by law. The second count of the indictment charged a fraudulent, fictitious, and dummy entry, under the homestead act, alleging that the entryman never made any settlement or improvement, nor had any residence on the land. The court charged the jury that the power of sale, and of purchase of coal lands is absolute and unrestricted, but that neither an individual nor corporation having once entered its quota could acquire additional lands by getting some one else to acquire the title for their benefit. The case is thus made to turn on the vital point of this case, whether the corporation here interested purchased the lands, or acquired them by indirect or dummy entries. And in U. S. v. Robbins, U. S. District Court of Utah, Sept. 2, 1907 (unreported), the indictment charged a conspiracy to acquire lands by fictitious and dummy entries made by other persons, with money furnished by defendants and in secret trust for them, with intent to defraud the United States. The indictment was sustained on demurrer by Judge Marshall, who held that a conspiracy to defraud, in order to fall within the prohibition of section 5440, must contemplate active deception, and not merely a failure to disclose all the facts, provided nothing was done to mislead. But he further held that the gist of the conspiracy there charged was to give the entries a false appearance for the purpose of misleading, under the rule applied in Stewart v. Wyoming Ranche Co., 128 U. S. 383, 388, 9 Sup. Ct. 101, 32 L. Ed. 439, and Tyler v. Savage, 143 U. S. 79, 12 Sup. Ct. 340, 36 L. Ed. 82. It will be observed that in all of these cases ruled under the coal land statute, the entries were indirect and fictitious, and that active fraud was employed, with intent to knowingly and willfully defraud the United States, while in this case all of these odious elements are entirely absent.

It is, however, urged in this case, with much persistency and ability, that the scheme disclosed in the indictment and evidence before

the commissioner was to pervert the settled policy of the coal land purchase statute adopted to secure fair play and prevent monopoly, by giving one man only one entry, and restricting the amount acquired to 160 acres and 320 acres respectively. This leads to a brief discussion of the legislation of Congress in disposing of the public domain. It is believed that such discussion will tend to clear up the question of policy involved in the coal land statute.

The first plan of disposal was by cash entry after auction sale, which finally took permanent form in the act of April 24, 1820, and remained in force for 70 years. Its great purpose was to create small tenures—small estates in the possession of individual owners—rather than the creation of large estates in single ownership, involving leases and tenants, and possibly slave labor. The auction feature secured fair play by giving all an equal opportunity to bid. Eldred v. Sexton, 19 Wall. 195, 22 L. Ed. 146. At the end of a short period the public sale was closed, and all unsold lands offered at cash entry. While any one might buy all he could pay for, yet as there was no incentive to acquire large estates, no transportation, little money and no agricultural machinery, the cash entry act operated to create in the northwestern territory free proprietors by the million, and thus hasten the civil war, and dominate the settlement of the stupendous questions of national sovereignty, state rights, and slavery. This happy policy of creating small tenures was worked out by natural economic forces, operating upon and in harmony with the cash entry act, rather than by anything written in the act itself. But by the pre-emption act of 1841, and the homestead act of 1862, the policy of encouraging small holdings is expressly adopted, and secured by rigid safeguards. The pre-emption law, passed after the flood tide of entries of 1836 had somewhat subsided, provided one pre-emption for one claimant, required an affidavit that he had not settled to sell on speculation, and that he had not made any contract or agreement by which the title he might acquire should inure to another's benefit. It also contained a prohibition of sale before patent, which, as already seen, was restricted by the Supreme Court in Myers v. Croft to mean sales before certificate, or sales of the right of entry. The purpose of this act was thus to secure fair play by giving all an equal chance, to give one person only 160 acres, to continue the important policy of creating small estates, and to relieve conditions which had grown up under the cash entry law in certain localities favored by nature as prospective centers of population, by preventing speculation. Although the pre-emption act contained sweeping provisions encouraging small tenures, which are entirely wanting in the coal land act, no case has ever decided and no one ever supposed that it was intended to prevent monopoly. Such an inference would have been utterly inconsistent with the existence of the free and favored power of unrestricted alienation, so greatly extended in Myers v. Croft. A monopoly, as generally defined or understood, is the exclusive control of supply and price, due either to a single ownership of a large part of the sources of supply, or unity of action among a large proportion of the owners of such sources. With monopoly in this sense neither

the pre-emption act nor the land act has anything to do, since there is nothing in either to prevent any person having sufficient means acquiring acres by the million under the policy of free disposition so greatly favored by the United States courts. The homestead act of 1862 simply continued the policy of the pre-emption law by including its provisions encouraging fair play, prohibiting speculation, in addition to giving a free home, with the same right of free disposal after certificate issued. The same policy was continued, though perhaps misapplied, in the stone and timber law of 1878. The administration of this act, which I cannot help thinking an unfortunate exercise of congressional power, has, I think, done more to create what is called the "land conscience" than all other land laws combined. When the government offers lands worth thousands or tens of thousands for a small percentage of their actual value, it is hardly to be expected that fraud can be prevented. A glittering temptation is held up, and it is not strange that weak human nature has yielded to it. In the coal land purchase act of 1873 a single one of the policies disclosed by the former acts has been retained. The policy of fair play, equal opportunity to acquire the land, most clearly appears, but without anything to discourage speculation or prior contract. It is most natural that the Interior Department, during an administration of 30 years, should have expressly encouraged sales or transfers of the right of entry. It is true that Mr. Justice Harlan, in the Trinidad Coal Company Case, 137 U. S. 160, 169, 11 Sup. Ct. 57, 34 L. Ed. 640, says that the object of the restrictions as to quantity was manifestly to prevent monopolies in these coal lands. But in this he means nothing more than that the policy of fair play and the initial creation of small estates was continued. Any other construction of his language, in view of the right of free disposal, and the express encouragement of the sale of rights of entry by the department, seems impossible.

No criminal conspiracy appearing either in the indictment or evidence, and no probable cause for believing petitioners guilty, all of the petitioning defendants should be discharged from imprisonment.

Two other questions are presented, and have been fully argued: Venue or jurisdiction, and the statute of limitations. The commissioner decided that the alleged conspiracy was formed in Wisconsin, and this conclusion is fully approved. No other is possible from the evidence. But the commissioner further held that overt acts in Colorado transferred the locus of the conspiracy to Colorado, so that the allegation of the indictment that the conspiracy was formed in Colorado could thus be proved. He thus held that there was evidence upon which a jury might convict in that state, assuming, as he did, that a crime had been actually committed.

As to the statute of limitations the commissioner decided in conformity to the rule of Ware v. U. S. (C. C. A.) 154 Fed. 577, that overt acts occurred within three years before the finding of the indictment, and were done with the conscious participation of defendants; and his conclusion was that the prosecution is not barred by the statute of limitations.

In view of the conclusion reached in this case it is unnecessary to decide either of these questions. The first one is disposed of in Arnold v. Weil, decided herewith.

An order will be entered discharging the defendants.